## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – –X

MARLENA SONN,

                   *Plaintiff,*

           v.

KENDALLE P. GETTY, *as Trustee of the Pleiades Trust and as an individual,* KPG INVESTMENTS INC., *as Trustee of the Pleiades Trust,* ALEXANDRA SARAH GETTY, *as Trustee of the Pleiades Trust and as an individual,* ASG INVESTMENTS INC., *as Trustee of the Pleiades Trust,* MINERVA OFFICE MANAGEMENT, INC., and ROBERT L. LEBERMAN,

                   *Defendants.*

– – – – – – – – – – – – – – – – – – – – – – – – – – – – –X

**Case No.  1:22-cv-2758** (          )


**COMPLAINT**


JURY TRIAL REQUESTED


       Plaintiff Marlena Sonn, by and through the undersigned counsel, makes this Complaint against Defendants Kendalle P. Getty, KPG Investments Inc., Alexandra Sarah Getty, ASG Investments Inc., Minerva Office Management, Inc. and Robert L. Leberman, and hereby alleges, based upon personal knowledge or information and belief, as follows:

### NATURE OF THIS ACTION

      1.     This is a breach of contract action involving various other statutory and common law claims arising from the ongoing retaliation, harassment, threats and intimidation that Plaintiff has endured over several years, after having repeatedly raised concerns about and objecting to Defendants' unlawful scheme to avoid paying an

estimated $300 million in taxes to the State of California, throughout the course of her employment relationship with the Defendants from 2013 through 2021.

2.      As set forth herein, Plaintiff brings this action to recover damages arising from Defendants' wrongful termination of her employment, in violation of the anti-retaliation provisions of the California's whistleblower statute, Cal. Lab. Code § 1102.5(b), including payments that are still contractually owed to her as compensation earned in the course of her employment and that have been wrongfully withheld in furtherance of the Defendants' unlawful retaliatory scheme.

## PARTIES

3.      Plaintiff Marlena Sonn ("Ms. Sonn") was employed by Defendants in various capacities from 2013 through 2021. Ms. Sonn is a resident of Brooklyn in the City and State of New York. At all times relevant to the allegations herein, Ms. Sonn worked primarily from her residence and/or office in New York, and occasionally traveled to California, Nevada, and elsewhere (*e.g.*, Hawaii, Oregon, Washington, Texas) at the Defendants' request.

4.      Defendant Kendalle P. Getty ("Kendalle")[1] is one of several heirs to the multi-billion-dollar fortune amassed by the infamous oil tycoon Jean Paul Getty, her grandfather. As is relevant here, Kendalle is one of several beneficiaries to the Pleiades

---

[1] Ms. Kendalle P. Getty and other members of the Getty family are referenced by their first names herein, so as to avoid confusion between various individuals who all share the same last name.

Trust, which has well over $1 billion in assets. Kendalle is a California domiciliary, who was residing in either California and/or New York at all times relevant to the allegations herein. Upon information and belief, Kendalle currently resides in Los Angeles, California and also maintains a secondary residence in New York City.

5. Defendant KPG Investments Inc., a/k/a Kendalle P. Getty Investments Inc. ("KPG Investments"), is the Nevada-based corporate trustee entity that represents Kendalle's interest in the Pleiades Trust. Kendalle is and was, at all times relevant to the allegations herein, the sole shareholder and president of KPG Investments. Upon information and belief, KPG Investments was formed for the purpose of residing in and representing Kendalle's interests from the State of Nevada, as part of a dubious estate planning strategy to avoid paying California state taxes on trust income—despite the fact that all or most trustees and beneficiaries of the Pleiades Trust are lifelong California domiciliaries. In addition to conducting business in Nevada, KPG Investments also regularly conducts a major portion of its business in California, New York and elsewhere, and continuously did so, at various times relevant to the allegations herein.

6. Defendant Alexandra Sarah Getty ("Sarah") is Kendalle's sister and is also a beneficiary of the Pleiades Trust. Upon information and belief, Sarah uses various other aliases, including the name Alice Sarah Blackwood. Sarah is a California domiciliary, who was residing in either California, New York and/or Japan at all times relevant to the allegations herein. Upon information and belief, Sarah currently resides in Los Angeles, California.

7.      Defendant ASG Investments Inc. a/k/a Alexandra Sarah Getty Investments Inc. ("ASG Investments"), is the Nevada-based corporate trustee entity that represents Sarah's interest in the Pleiades Trust. Sarah is and was, at all times relevant to the allegations herein, the sole shareholder and president of ASG Investments. Upon information and belief, ASG Investments was formed for the purpose of residing in and representing Sarah's interests from the State of Nevada, as part of a dubious estate planning strategy to avoid paying California state taxes on trust income—despite the fact that all or most trustees and beneficiaries of the Pleiades Trust are lifelong California domiciliaries. In addition to conducting business in Nevada, ASG Investments also regularly conducts a major portion of its business in California, New York and elsewhere, and continuously did so, at various times relevant to the allegations herein.

8.      Defendant Minerva Office Management, Inc. ("Minerva") is a Nevada corporation with its principal office in the "Airport Gardens" office complex located at 1325 Airmotive Way in Reno, Nevada. Minerva functions as the trust administration office for the Pleiades Trust and several other successor trusts to the original Getty Family Trust. Upon information and belief, Minerva's office location was chosen for its proximity to the private jet terminal at the Reno-Tahoe International Airport so that its ultra-high net worth clients can easily fly in from high tax jurisdictions like California to conduct business from Nevada, which does not levy income taxes on individuals or corporations (or trusts), and which has become an increasingly popular tax haven due to its notoriously lax financial regulations and policy against sharing information with the Internal Revenue Service

("IRS").[2] In its capacity as the trust administration office, Minerva informally participates in the decision making of the individual corporate trustees of the Pleiades Trust.

9.      Defendant Robert L. Leberman ("Mr. Leberman") is President of Minerva Office Management, Inc., and serves as the Trust Administrator for several successor trusts to the original Getty Family Trust, including the Pleiades Trust; he is also Chief Executive Officer of Vallejo Investments Inc., a San Francisco based family office and investment fund that manages assets for Kendalle and Sarah's father, Gordon P. Getty ("Gordon"), and serves as an officer, director, and/or agent of numerous other corporations formed by or for various members of the Getty family. In addition, Mr. Leberman is Chief Executive Officer of The Ann and Gordon Getty Foundation, a California nonprofit for which Kendalle and Sarah serve on the Board of Directors. Upon information and belief, Mr. Leberman is a California domiciliary who occasionally resides in and/or conducts business from Nevada and elsewhere. In his capacity as Trust Administrator, Mr. Leberman

---

[2] Nevada and Texas are the only United States jurisdictions that do not have an information sharing agreement with the IRS. In addition, Nevada's statutory framework surrounding financial disclosures was expressly designed to generate revenues by offering financial secrecy protections that rival offshore tax havens such as the Cayman Islands and Panama. *See, e.g.*, Brian Grow, Kelly Carr, *Special Report: Nevada's Big Bet on Secrecy*, REUTERS (Sept. 26, 2011), https://www.reuters.com/article/us-shell-games-nevada/special-report-nevadas-big-bet-on-secrecy-idUSTRE78P1Y020110926; J. Weston Phippen, *Nevada, a Tax Haven for Only $174*, THE ATLANTIC (Apr. 6, 2016), https://www.theatlantic.com/national/archive/2016/04/panama-papers-nevada/476994/; Iain Marlow, *South Dakota and Nevada Play Surprisingly Large Role in Pandora Papers Tax Avoidance Leak*, FORTUNE (Oct. 4, 2021), https://fortune.com/2021/10/04/south-dakota-nevada-play-large-role-in-pandora-papers-tax-avoidance-leak/.

informally participates in the decision making of the individual corporate trustees of the Pleiades Trust.

## JURISDICTION AND VENUE

10.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between citizens of New York, California and Nevada, where the amount in controversy exceeds $75,000, exclusive of interest and costs.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims herein occurred within this district.

## FACTUAL ALLEGATIONS

### A.  History of the Pleiades Trust

12.     The Pleiades Trust is one of several successor trusts to the original Getty Family Trust, a California trust that was established by Jean Paul and Sarah C. Getty in 1934.

13.     Jean Paul Getty founded the Getty Oil Company ("Getty Oil") and was deemed to be the richest man in the world at various points during his lifetime. He died on June 6, 1976, leaving most of his fortune and his shares in Getty Oil to his children and their heirs through the trust. At the time of his death, Jean Paul Getty had an estimated net worth of $6 billion (approximately $22 billion in today's terms).

14.     Several months later, Congress enacted the generation-skipping transfer tax through the Tax Reform Act of 1976, which is a federal tax that applies to outright gifts and transfers in trust to any beneficiary that is more than one generation younger than the donor, such as grandchildren. Any trust that was established prior to its enactment, however, is said to be grandfathered and exempt from generation-skipping transfer tax altogether, and the Getty family has dedicated considerable efforts towards maintaining its exempt status through the original trust.

15.     Kendalle and Sarah's father, Gordon P. Getty, is the fourth son of Jean Paul Getty, and became the sole acting successor trustee of the Getty Family Trust shortly after his father's death.

16.     In the 1980s, the beneficiaries of the original Getty Family Trust became embroiled in litigation due to a bitter dispute over Gordon's alleged mismanagement, which culminated with his attempt to fleece all future beneficiaries by liquidating the trust's principal asset and controlling interest in Getty Oil through a controversial sale to the Texaco Oil Company in 1984.[3] The trust was eventually partitioned amongst various feuding factions of the family, as part of a settlement agreement that ended the litigation several years later.

17.     According to articles published in *The New York Times* on May 10 and 31, 1985, the partition was only made possible after the Getty family successfully lobbied the

---

[3] *See Getty v. Getty*, 205 Cal. App. 3d 134, 252 Cal. Rptr. 342 (Ct. App. 1988).

State of California to pass emergency legislation allowing for a family trust to be split upon the agreement of all heirs.[4]

18.     Additionally, the settlement agreement was conditioned upon the family's ability to obtain a favorable private letter ruling from the IRS—which was indeed issued, on October 21, 1988—confirming that any successor trusts established through the partition would still be treated as having been established by the original 1934 Declaration of Trust, and would not, therefore, expose the trust or its beneficiaries to the otherwise applicable generation-skipping transfer tax.

19.     The Gordon P. Getty Trust is one of several successor trusts that was created pursuant to the court-approved partition agreement entered by order of the California Superior Court, on December 8, 1988. Aside from dividing the family's assets into separate trusts, the partition order did not otherwise alter any of the dispositive provisions in the 1934 Declaration of Trust. Accordingly, like the original trust, the successor trust was established for the benefit of Gordon, as the sole income beneficiary during his lifetime, and for the benefit of his children as contingent remainder beneficiaries upon his passing. Upon information and belief, Gordon is also the income beneficiary of the Ronald A. Getty Trust, which is another successor trusts created by the 1988 partition order.

---

[4] Thomas C. Hayes, Bill to Split Getty Trust is Signed in California, NEW YORK TIMES (May 10, 1985), https://www.nytimes.com/1985/05/10/business/bill-to-split-getty-trust-is-signed-in-california.html; *Accord on Split Of Getty Trust*, NEW YORK TIMES (May 31, 1985), https://www.nytimes.com/1985/05/31/business/accord-on-split-of-getty-trust.html.

20.     Gordon had four sons with his wife, Ann Gilbert Getty, to whom he remained married until she died of a heart-attack on September 14, 2020. As his only "lawful issue," the four sons were the only presumptive contingent beneficiaries of the successor trusts.

21.     As it turns out, however, Gordon had also secretly fathered three daughters, who were born from an extramarital affair with his former mistress, Cynthia Beck ("Ms. Beck"), and who were not formally recognized as his legal issue at birth.

22.     In or around 1995, the administration of the Gordon P. Getty Trust and several other successor trusts to the original Getty Family Trust was transferred from California to Nevada, as part of a deliberate strategy to avoid paying California state taxes on trust income. In order to effectuate this strategy, each of the individual beneficiaries was assigned to a corporate trustee, *i.e.,* a Nevada-based corporation formed in their name, for the purpose of residing in and serving as trustee from the State of Nevada in their stead, so that each beneficiary could continue living in California—or any other high-tax jurisdiction of their choice for that matter—while income to the trust continued to accumulate tax-free in the State of Nevada.

23.     In 1999, Ms. Beck filed a petition with Los Angeles Superior Court, seeking to have Gordon publicly recognize her three daughters (Kendalle, Sarah, and Nicolette) as his natural children—and more importantly, as his "lawful issue," for the purpose of establishing their right to inherit a portion of the Getty fortune under the original 1934 Declaration of Trust. Gordon did not oppose the petition, and eventually entered into a

settlement agreement that involved another partitioning of the trust for the benefit of the three daughters.

24.     In 2004, the Gordon P. Getty Trust was partitioned into two separate trusts—the Orpheus Trust and the Pleiades Trust—both of which would continue to benefit Gordon, as the principal income beneficiary, during his lifetime. The contingent beneficiaries of the Orpheus Trust are Gordon's sons. The contingent beneficiaries of the Pleiades Trust are Gordon's three daughters (*i.e.,* Kendalle, Sarah, and Nicolette).

25.     As they had previously done in conjunction with the first partitioning, the Getty family again sought—and successfully obtained—a private letter ruling from the IRS, seeking assurances that these additional successor trusts could also be treated as having been established by the original 1934 Declaration of Trust, so as to avoid any generation-skipping transfer taxes.

26.     KPG Investments Inc. is the Nevada-based corporation that was formed to serve as the corporate trustee of the Pleiades Trust for Kendalle, who is a lifelong domiciliary of California. ASG Investments Inc. is the Nevada-based corporation that was formed to serve as the corporate trustee of the Pleiades Trust for Sarah, who is also lifelong domiciliary of California. A similar corporate entity was also created for their sister, Nicolette.

### B.  Ms. Sonn's work as a personal financial advisor to Kendalle and Sarah

27.     In or around April 2013, Ms. Sonn was introduced to Kendalle through a colleague named Catherine Tullner ("Ms. Tullner"), who was working as a personal

attorney for Nicolette. At the time, Ms. Sonn was a Financial Advisor at Christopher Street Financial in New York, and was known for her particular expertise in socially responsible investment strategies.

28.     Kendalle was residing in New York around that time and had not been particularly active in managing her personal investments up to that point, but wanted to be more informed and involved. Kendalle and Ms. Sonn instantly bonded over their shared progressive ideals, and Kendalle expressed that she wanted her investments to reflect these purported values.

29.     When Kendalle first joined Ms. Sonn's client roster, her personal investment account—worth approximately $5 million—was managed by Goldman Sachs. Kendalle thought she was invested in a "values-aligned" portfolio. Upon examination, however, Kendalle learned that her investments at Goldman were not values-aligned at all and that her portfolio was, in fact, mostly comprised of various exchange-traded funds designed to provide broad exposure to the market, rather than targeted investment in companies or sectors aligned with progressive values.

30.     In or around August 2013, Kendalle transferred $1 million from her portfolio at Goldman Sachs to Christopher Street Financial, where it was agreed that Ms. Sonn would invest the funds in a manner consistent with Kendalle's stated interests, ethics, and values. It was also agreed that Ms. Sonn would charge Kendalle the typical fee of 1% on Assets Under Management ("AUM"), which is consistent with the standard industry rate for personal financial advisory services.

31.     Kendalle was immediately impressed with Ms. Sonn's management of her personal investments. The values-aligned portfolio performed extraordinarily well from the very outset, outperforming both the benchmark and the investments in Kendalle's portfolio at Goldman Sachs over the course of the next few months.

32.     Kendalle was so pleased with Ms. Sonn's stellar performance that she referred her sister Sarah, who also joined Ms. Sonn's client roster, in or around October 2013.

33.     Shortly thereafter, Ms. Sonn began attending the quarterly meetings where Kendalle, Sarah and Nicolette would meet with their father Gordon and various advisors to discuss and vote on various matters relating to the administration of the Pleiades Trust.

34.     Kendalle eventually moved all of her personal investments over from Goldman Sachs to Ms. Sonn, whose investment strategies continued outperforming benchmark and delivering excellent returns .

35.     As the relationship developed, Kendalle increasingly began calling upon Ms. Sonn for assistance with various personal matters that were not within the scope of her role as Kendalle's personal financial advisor. Some of these requests were arguably financial in nature, such as helping Kendalle deal with bills and other expenses, but Kendalle would also routinely turn to Ms. Sonn for help and advice on things like hiring movers for her apartment or logistics surrounding her art business. She also regularly turned to Ms. Sonn for advice on interpersonal relationships with various family members, roommates, and/or romantic partners, which were sometimes tangentially related to her finances, but mostly just used an opportunity for Kendalle to vent.

36.     Ms. Sonn often found herself wondering whether she should set firm boundaries, but also sincerely wanted to help Kendalle, who was clearly struggling with depression and/or other emotional issues that made it difficult for her to handle basic life stresses.

37.     Anytime that Kendalle was in crisis, she would call on Ms. Sonn for help. On multiple occasions, Ms. Sonn was there for Kendalle in times of need, to clean up her messes and help her navigate personal troubles or perceived emergencies.

**C.  Ms. Sonn is asked to take on a more formal role with respect to the Pleiades Trust**

38.     In the fall of 2014, Sarah asked Ms. Sonn to assume a more formal advisory role with respect to the management of the Pleiades Trust, by assuming the role of Vice President for ASG Investments. The role would require Ms. Sonn to become a W2 employee of ASG Investments and leave her position at Christopher Financial Street, but would also allow her to continue working with other private clients as an independent financial advisor.

39.     Ms. Sonn accepted the offer and was formally appointed as Vice President of ASG Investments on October 15, 2014. In terms of compensation, it was agreed that Ms. Sonn would be paid an annual base salary of $80,000, which would be reviewed annually and adjusted by the payment of a bonus, the amount of which, if any, would be left to Sarah's sole discretion.

40.     Ms. Sonn's responsibilities as Vice President of ASG Investments included attending all Trust meetings and voting on Sarah's behalf when necessary. Ms. Sonn also

provided consultation on investment strategies and related financial planning matters, procured and supervised various professionals for the purpose of filing tax returns and maintaining corporate registrations, and managed various aspects of Sarah's personal affairs, including miscellaneous business ventures, art projects, and real estate and property management related tasks.

41.     Shortly thereafter, Ms. Sonn started performing essentially all of the same functions for Kendalle and KPG Investments as well—though she was not formally appointed (or compensated) as Vice President for KPG Investments until about a year later.

42.     Ms. Sonn was formally appointed as Vice President of KPG Investments on November 1, 2015. The terms of her compensation agreement with Kendalle and KPG Investments was similar to that which she already had in place with Sarah for her role as Vice President of ASG. Specifically, it was agreed that Ms. Sonn would receive an annual base salary of $100,000 from KPG Investments, together with discretionary bonus payments in an amount to be determined by Kendalle.

43.     Ms. Tullner had assumed the position of Vice President for Nicolette's corporate trustee entity, NG Investments Inc., in or around July 2014, and worked closely with Ms. Sonn on matters relating to the Pleiades Trust in that capacity.

44.     Although Ms. Sonn was generally aware of the trustees' efforts to maintain the appearance that all business relating to the Pleiades Trust was being conducted in Nevada, she was genuinely shocked when Francis Nash ("Mr. Nash")—an employee of Minerva who served as Treasurer and Secretary for ASG Investments, KPG Investments

and all other corporate trustee entities for the Pleiades Trust—informed her that they would not be withholding New York State taxes or making any of the other applicable employer contributions required by New York State law (*e.g.,* disability insurance, paid family leave) as part of its payroll processing—because Minerva wanted to avoid the appearance that it was conducting any business outside of Nevada. Ms. Sonn was also informed that ASG and KPG could not provide her with health insurance benefits , or any other traditional employee benefits, for the same reason.

45.     This reasoning made very little sense to Ms. Sonn, seeing that her New York address was listed on her W2s. Nevertheless, Ms. Sonn accepted these conditions, as she did not want to cause problems for Sarah and Kendalle *vis-à-vis* Minerva or its President, Mr. Leberman, who was a trusted advisor to their father, Gordon, and with whom they already had a history of conflict.

46.     In addition to assuming the role of Vice President for ASG Investments and KPG Investments, Ms. Sonn continued to serve as a personal financial advisor to both Kendalle and Sarah, for which she was compensated through the same standard 1% fee on AUM that she had previously charged to their accounts while working at Christopher Street Financial.

**D.  Ms. Sonn excels in her role as Vice President for ASG and KPG Investments**

47.     In her capacity as Vice President of ASG Investments and KPG Investments, Ms. Sonn encouraged Kendalle and Sarah to assert their independent interests and opinions on matters relating to the Pleiades Trust, and empowered them to do so even

when faced with potential opposition from their fathers' advisors or other individuals involved in the trust's management.

48.      In early 2015, for example, in her capacity as Vice President of KPG Investments, Ms. Sonn retained a trust and estates attorney named Jennifer Brown ("Ms. Brown") in the New York Office of Patterson Belknap Webb & Tyler LLP as outside counsel to KPG Investments, so that Kendalle would have an independent legal advisor representing her interests alone, instead of relying on the legal counsel of attorneys representing other parties' and entities' interests with respect to the Pleiades Trust as she had done in the past.

49.      On March 31, 2015, Kendalle and Sarah's half-brother, Andrew Getty, died of a drug overdose. When Kendalle learned that he had been found unresponsive in his Los Angeles mansion, she did the same thing she had done in all other times of crisis and called Ms. Sonn in a panic.

50.      At Kendalle's request, Ms. Sonn flew to meet Kendalle in San Francisco the very next day, in order to provide emotional support and help her deal with her affairs. This trip to San Francisco necessarily included Pleiades Trust business because Andrew's passing would trigger a redistribution of assets from the Orpheus Trust to the Pleiades Trust.

51.      During the course of the accounting process for the redistribution of assets from the Orpheus Trust, Ms. Sonn learned that there was a discrepancy of approximately $59 million between the estimated value of Orpheus and its actual value, resulting in a

possible loss of an estimated $15 million to the Pleiades Trust. This discrepancy could have been attributable to differences between investment performance, additional expenses, or other causes, but the Pleiades Trustees were never able to determine the cause, since the performance reporting for Orpheus was kept secret by Mr. Leberman.

52.    Ms. Sonn advised Kendalle and Sarah of the discrepancy and discussed whether they should demand a full audit of the Orpheus Trust, but they ultimately decided that nothing good would come out of it, and opted to use the discrepancy as leverage to effectuate changes that they truly cared about instead—namely, a shift in the investment strategy of the trust to values align the portfolio as they had done with their personal investments under Ms. Sonn's management. Throughout the course of their relationship, Kendalle and Sarah had repeatedly expressed their desire to divest from fossil fuels and to approach their investments as a means for providing reparations of sorts, to account for the fact that the origin of their tremendous wealth was inextricably intertwined with the history of the oil and gas industry, its connection to the climate change crisis, and the legacy of extraction in the Ecuadorian Amazon (one of the top ten environmental disasters in modern history, which provided Texaco the capital to purchase Getty Oil). Having previously faced resistance to their initiatives to values align the investment portfolio of the Pleiades Trust, they viewed this development as an opportunity to revisit these conversations.

53.    During the second half of 2015, Ms. Sonn led the charge to change management of the Pleiades Trust's investment portfolio from Strategic Investment

Solutions ("SIS"), which had previously served as the trust's investment advisor since its inception, and which was potentially responsible and/or complicit in the circumstances leading to the mysterious underperformance of $59 million from the Orpheus Trust.

54.     Other individuals involved in the trust's management—including, perhaps most importantly, Mr. Leberman—were strongly opposed to this change, based on their longstanding relationship with SIS, but ultimately agreed to the change after being confronted with the fact that $59 million had gone missing from the Orpheus Trust under their management.

55.     It bears noting that this glaring example of mismanagement and possible breach of fiduciary duty was committed by the very same individuals who later had a role in forcing Ms. Sonn out of her position as Vice President of ASG and KPG Investments.

56.     Despite the opposition that her leadership engendered, Ms. Sonn continued to excel in her role by every conceivable metric. In the final quarter of 2015, Ms. Sonn arranged for and oversaw the transition in management of the Pleiades Trust's investment portfolio from SIS to Cornerstone Capital and then generated successful investment strategies that consistently outperformed benchmarks while also leading the charge to divest from fossil fuels and implement other policy changes to values align the portfolio.

57.     Notably, the investment strategies that Ms. Sonn devised and implemented with the Pleiades Trust portfolio also significantly outperformed those of the Orpheus Trust, which had remained under the management of SIS.

58.     Although these successes were largely owing to Ms. Sonn's thought leadership and supervisory role over the investment portfolio, her total annual compensation was a pittance compared to the $1 million that was paid in annual consulting fees to Cornerstone in 2018 and $1.1 million paid in 2019, for example—and as compared to all other individuals who performed similar functions for the other successor trusts to the original Getty Family Trust.

### E.  Ms. Sonn asks Defendants to reconsider her compensation structure; receives deferred compensation incentives in recognition of her outstanding performance

59.     In or around mid-2017, Ms. Sonn asked Sarah and Kendalle to reconsider her compensation structure in light of these extraordinary accomplishments and to account for all of the additional responsibilities she had taken on in her supervisory role over the investment portfolio of the Pleiades Trust.

60.     Ms. Sonn's request was eminently reasonable given the circumstances. When Ms. Sonn had originally taken on the role of Vice President for the corporate trustee entities representing Kendalle and Sarah's interests in the Pleiades Trust, it was based on the understanding that she would continue working for and providing independent financial advisory services to other private clients—but the scope of her duties had expanded so significantly that Ms. Sonn no longer had time for any other professional endeavors. More importantly, however, Ms. Sonn's annual compensation was dramatically below industry standards for anyone performing similar work and/or achieving commensurate results in the market.

61.     In light of her outstanding performance—and recognizing the need to retain Ms. Sonn's services—Sarah and Kendalle both separately agreed to provide Ms. Sonn with a deferred compensation incentive equal to 37.5 basis points (.00375%) of the aggregate after-tax amount of any distributions they received from the Pleiades Trust, payable in two installments following the death of their father, who was believed to be nearing the end of his life and upon whose passing they would begin to receive such distributions.

62.     This compensation structure was designed, in part, to bring Ms. Sonn's compensation in line with the standard industry practice of setting compensation based on AUM and closer to standard market rates—which average 54.2 basis points (.00542%) annually of AUM for institutional portfolios or 100 basis points (*i.e.* one percent, or 1%) annually for personal wealth management.

63.     Ms. Sonn would have, of course, preferred an immediate cash bonus over this deferred compensation structure, but understood Kendalle's and Sarah's wanting to delay the payments until such time as they gained access to the trust corpus, upon their father's passing. After considerable back-and-forth negotiations, Ms. Sonn agreed to the proposed compensation structure, based in part on her understanding that the triggering event (*i.e.*, Gordon's passing) was likely imminent, given his advanced age and deteriorating health.

64.     These deferred compensation incentives were memorialized in an agreements signed by Sarah for ASG Investments on October 20, 2017, and in a separate agreement signed by Kendalle for KPG Investments on November 11, 2017.

65.     Over the course of the next few years, Ms. Sonn continued on the same trajectory, consistently exceeding expectations and outperforming the market, and adding substantial value to the Pleiades Trust, all while continuously serving as a fierce and loyal advocate for Kendalle and Sarah's interests.

66.     During the six-year period from 2015 to 2020, the Pleiades Trust corpus grew from approximately $600 million to over $1 billion under Ms. Sonn's leadership, notwithstanding a significant shift in the Trust's investment strategy and generous annual payouts to Gordon.

67.     Although Kendalle and Sarah's receipt of trustee fees and participation payments was not based upon the underlying value of the Pleiades Trust, the growth of the portfolio owing to Ms. Sonn's successful investment strategies was certainly factored into the amount of the sizeable income distributions that Gordon received from the trust, which arguably benefited them too. From 2015 through 2020, Gordon received income distributions totaling approximately $176 million from the Pleiades Trust, some amount of which was then used to finance loans to Kendalle and Sarah.

68.     And, more importantly, the overall growth of the trust corpus benefited Kendalle and Sarah as the contingent remainder beneficiaries of accumulated trust income upon their father's passing.

**F.  Ms. Sonn raises concerns about California tax avoidance scheme and endures unlawful retaliatory consequences as a result**

69.     From the very beginning of her time working on matters related to the Pleiades Trust, Ms. Sonn was repeatedly advised, by Mr. Leberman and others, about the importance of maintaining the appearance that Kendalle and Sarah were neither residing in, nor conducting trust business, in the State of California.

70.     As is relevant here, California law provides that the taxation of trusts is governed by the residence of its beneficiaries and fiduciaries; specifically, the income of a trust is taxable in California if a "fiduciary or [non-contingent] beneficiary… is a resident, regardless of the residence of the settlor," or in the case of a corporate fiduciary like KPG Investments, "where the corporation transacts the major portion of its administration of the trust" in California. Cal. Rev. & Tax. Code § 17742.

71.     When the successor trusts to the original Getty Family Trust were first moved from California to Nevada, the idea was that the residence of all fiduciaries could be kept out of California through the creation of the corporate trustee entities, which were established for the purpose of residing in and administering the trust from the State of Nevada.

72.     The viability of this estate planning strategy, as a means for avoiding California state taxes on the trust's income, was questionable from the outset, seeing that Gordon—the only non-contingent beneficiary of these trusts—is a lifelong California domiciliary who has continually maintained his principal residence in California throughout most, if not all, of his adult life.

73.     Setting that aside, however, the objective of this strategy was to defer and limit the taxation of accumulated trust income until the time of distribution, at which point it would only become taxable under California's "throwback" rule, Cal. Rev. & Tax. Code § 17745(b), if the beneficiary was a resident of California at the time of such distribution, and only to the extent that such beneficiary was also a resident of California at the time that such income was accumulated in the trust.

74.     In an article published by *Forbes* magazine on November 27, 2018, it was noted that, although these types of estate planning strategies occupy a legal gray area, the "calculated risk" might be worth it "if one is careful, willing to bear some risk, and there is sufficient money at stake."[5]

75.     Upon information and belief, the Getty family's powerful political connections and long-standing relationship with the current Governor of California is a major factor in the overall assessment of this so-called "calculated risk." The Getty family has long wielded political influence in California, and even more so since Gavin Newsom became governor. As is relevant here, the father of Governor Newsom was the administrator of the original Getty Family Trust for many years, and Governor Newsom has himself benefited from the Getty fortune via Gordon's generous investments in his private business ventures and campaign contributions.

---

[5] Robert W. Wood, *13.3% California Taxes Triggers Moves & Trusts to Avoid Taxes*, FORBES (Nov. 27, 2018) https://www.forbes.com/sites/robertwood/2018/11/27/13-3-california-taxes-triggers-moves-trusts-to-avoid-taxes/?sh=79b353ff5e79.

76.     Throughout the course of her employment as Vice President of ASG Investments and KPG Investments, one of Ms. Sonn's unstated roles was to ensure that all business related to the administration of the trust was kept out of California, and to keep Kendalle and Sarah's residency status outside of California, wherever possible, so as to avoid and/or mitigate her tax liabilities under California's "throwback" rule for any years during which Kendalle could conceivably claim to have resided elsewhere.

77.     In 2016, Kendalle left New York and began spending significantly more time in California, and issues relating to her lawful place of residence became an increasingly frequent topic of conversation; specifically, Kendalle conveyed that she wanted to live in Los Angeles, but was worried that by renting or purchasing a residence there in her own name, she would subject the Pleiades Trust to California State taxes.

78.     Sarah was primarily living in Japan at the time, but also expressed frustrations about having to factor potential tax liabilities into decisions about how and where to spend her time.

79.     During these conversations, Ms. Sonn observed that Kendalle and Sarah's discomfort around these issues less about their own desire to avoid paying California state taxes on trust income and more about their hesitancy to oppose the recommendations of their father's advisors on the subject. It was equally clear that these issues were becoming a major source of stress and anxiety, for Kendalle especially, in making decisions about where and how to live her life.

80.     Based on the foregoing, Ms. Sonn was increasingly of the view that Kendalle and her sisters should move the trust back to California and simply bear the corresponding tax burden, so that they could live and do business wherever they pleased without having to participate in the charade that the Pleiades Trust was being administered from Nevada.

81.     From Ms. Sonn's perspective, there simply was no basis for claiming that the Pleiades Trust was not being significantly administered from California, given the numerous trust activities taking place in California, and given the fact that all beneficiaries, as well as most of the trustee fiduciaries, were living in California.

82.     Ms. Sonn openly conveyed these concerns to Kendalle and Sarah—and to Mr. Leberman as well, who did not appreciate her perspective, seeing that his entire value proposition was minimizing the Getty's tax liabilities through precisely these types of estate planning strategies.

83.     Concerns about the Pleiades Trust's artificial—and, indeed, fictional— placement in Nevada came to a head in or around mid-2018, when Kendalle, Sarah, and Nicolette began to question the decision to keep the trust's administration in Nevada, even after all three sisters had moved back to California and were residing there on a more permanent basis.

84.     By that point, Sarah had moved back to from Japan and was splitting her time between Los Angeles and New York, Kendalle was renting an apartment in Los Angeles, and Nicolette had already been residing primarily in California for at least several years.

85.     On July 25, 2018, Nicolette sent an email to Mr. Leberman and others, essentially accusing him of misleading the beneficiaries of the Pleiades Trust about their California tax obligations, as follows:

> Until recently I had thought the California Throwback tax was merely some kind of inheritance tax for California residents. I was sorely mistaken. I discovered that the Pleiades and Orpheus Trusts should have been paying California income tax this entire time, because basically all trustees and beneficiaries are California residents…we are losing literally millions of additional dollars, because of the costs of quarterly out-of-state meetings for 30+ people in expensive hotels… using private jets, etc… The carbon cost of these meetings is quite sizable too… Additionally, the trusts could operate much more efficiently if they were California trusts and were allowed to make decisions and do business throughout the year instead of on only 4 designated days a year. As one who will be paying for all these avoided taxes and these expensive out-of-state meetings, I find it distasteful. I feel it is my fiduciary duty to point out that we are wasting a good deal of money on this. The trusts should become California trusts and pay the California tax that we rightfully owe…

86.     Several conversations and meetings took place about these issues over the following months. In one such meeting, in or around October 2018, Mr. Leberman also gave a presentation in which he argued that the California taxation issues were not "black and white," and that the expense and inconvenience of keeping the trust's administration in Nevada was negligible compared to the overall financial impact and potential tax savings that they might be able to realize if the dubious strategy turned out to be successful.

87.     Kendalle, Sarah and Nicolette were initially very skeptical and unpersuaded by Mr. Leberman's presentation, as was Ms. Sonn and KPG Investments' outside counsel at Patterson Belknap Webb & Tyler LLP.

88.     Between 2018 and 2021, Ms. Sonn repeatedly encouraged Kendalle and her sisters to just pay the California taxes, as demonstrated by the following text message exchange:





89.     In the end, however, Mr. Leberman ultimately prevailed in the controversy over whether to move the trust's administration back to California.

90.     By May 24, 2019, Mr. Leberman had fully converted everyone except for Kendalle to the view that keeping the trust's administration in Nevada would inure to their benefit, as demonstrated by the following paragraph in an email sent by Nicolette to her sisters:

> When we do decide to dissolve our individual trusts, they will be subject to California Throwback tax only if you live in California, and if we do not live in California, they are not. Same as before. The difference is that we get to choose the timing. We can live in California for now if we want to, without penalty, as long as we move out of state for a year before we are ready to access the trust principal. It would be nice to not feel obliged to move away right when Dad is dying. I would rather be near him and spend time with him when the time comes.

91.     In another email exchange dated May 30, 2019, Nicolette essentially pleaded with Kendalle to go along with the tax avoidance scheme "[a]s a kindness to your siblings," if for no other reason, because it would save each of them about $30 million dollars in taxes, irrespective of the fact that they were all California domiciliaries—adding that "those of us living in [California] at the time of dad's death would then make plans to move out of state for 1-2 years," to avoid California's throwback rule.

92.     As others became more comfortable with the tax avoidance scheme, Ms. Sonn only grew more skeptical. "I definitely don't want the expectation to be built up that you can live in CA and not pay the tax," she stated, in a subsequent email exchange on May 30, 2019. "Just pay it if you're staying in CA, it[']s fine. Really. Just enjoy your time there."

93.     Throughout the COVID-19 pandemic, trust meetings took place by Webex, with all or most of the trustees and beneficiaries calling in from California. Mr. Leberman assured everyone that this was fine due to the shelter in place orders that had been issued in both California and Nevada at the beginning of the pandemic.

94.     Even after the shelter in place orders had been lifted, however, the meetings continued to take place via Webex with substantially all of the beneficiaries and trustees attending from California.

95.     Over time, Kendalle also became more comfortable with the status quo and began to discourage Ms. Sonn from raising her objections and concerns about the legality of the California tax avoidance scheme.

96.     When Ms. Sonn informed Kendalle that the shelter in place orders had been lifted and suggested they not attend meetings via Webex from California, for example, Kendalle—texting with Ms. Sonn from California—essentially told Ms. Sonn to let it go, because Mr. Leberman always gets his way, whether his activities are illegal or not:



97.    Although all three sisters had originally been aligned with Ms. Sonn in voicing objections to the dubious tax avoidance scheme, it became increasingly clear that a shift had occurred as of late 2019, and that Ms. Sonn's dissenting views on the matter were no longer welcome.

98.    Meanwhile, Mr. Leberman and others who were aligned with him on the California tax evasion scheme began rallying against Ms. Sonn, with the ultimate goal of forcing her out of her trustee positions for the Pleiades Trust altogether.

G. **Retaliatory termination from ASG Investments**

99.    On or about January 27, 2021, Ms. Sonn learned that she was being terminated from her role as the Vice President for ASG Investments.

100.    Ms. Sonn was shocked by this news, seeing that Sarah had just thanked her for doing such an excellent job at the Trust meeting one day earlier.

101.    When asked to elaborate on her reasons for the termination, Sarah stated that the decision had nothing to do with Ms. Sonn's performance, but rather, was a result of interpersonal conflicts and differences of opinion between Kendalle (and by association, Ms. Sonn) and the other trustees.

102.    The following email further suggests that Sarah wanted to do right by Ms. Sonn, in terms of providing a severance package that would account for and replace the deferred compensation incentive that was slated to pay out upon Sarah's receipt of income distributions from the trust after her father's passing:

> **From:** [Sarah]
> **To:** [Ms. Sonn]
> **Date:** Wednesday, January 27, 2021 at 4:49 PM
> **RE**: What we discussed earlier
>
> Yesterday was a wonderful victory, and I'm grateful for your patience with Nicolette.
>
> After the meeting, dad called me, though, saying he'd like me to participate more and I agree. I have thought long and hard about this, and I've come to this conclusion.
>
> Marlena, let me preface this by stating this is by no means a reflection of your skill, conduct or performance as my VP.
>
> However, as I discussed with you on the phone, in order to avoid KPG as much as possible, be a more active player in the Trust, and to avoid any further social stresses that occur being divergent opinions you and my best friend, Nicolette have, I have decided to release you as a VP. **I am willing to negotiate a severance package, but I do not believe the former agreement applies given that the amount at termination would be independent of your efforts for me after this point. I love you and would love to**

**have you still be my personal financial advisor, but I would like to terminate your contract as a VP for ASG investments.**

Thank you for all you've done.

(emphasis added).

103.    Ms. Sonn responded to that email as follows, the next day:

From: [Ms. Sonn]
To:  [Sarah]
Date: Wednesday, January 28, 2021 at 10:58 AM

Hi [Sarah],

… I am grateful for our relationship and would like to keep working with you as your VP. I am asking for an opportunity to discuss the situation, and for you to reconsider.

But, if this decision is final, I trust that you will be fair in my severance compensation. As we've discussed, my work has added very significant outperformance to the Trust. In light of this performance record, I would of course expect to be fully and fairly compensated.

In recognition of that[,] I would suggest the below:

1.   I agree that your section of the Trust's value will be independent of my input in future years. Therefore, how about we base my termination bonus on Trust value as of 12/31/2020, for a clean break?  In our 2017 agreement, the stated incentive bonus was 25 basis points of the Trust Corpus, *i.e.* one quarter of one percent.

2.   In addition, I would like an added performance bonus for the relative outperformance compared to what the Trust was averaging when I first began my tenure in October of 2013, based on the value of the corpus on September 30, 2020. Let's talk about a number that feels fair.

3.   Finally, as we are in unprecedented times of great economic uncertainty because of the global pandemic, I would ask for an additional severance of one year's salary. I think in light of all that we have been through together, that feels fair.

Let's talk on the phone about it, and not have this turn into an adversarial thing.

I know we can get through this, and find a way to keep working together.

104.    Consistent with the terms of the deferred compensation that had previously been promised to Ms. Sonn, Sarah agreed to a severance package that would include the payment of $2.5 million to Marlena, representing approximately .0025% of the $1 billion value of the Trust as of December 31, 2020. The only outstanding issue, per Sarah's email, was whether the payment could be made in installments, as opposed to a single lump sum:

> **From:** [Sarah]
> **To:**  [Ms. Sonn]
> **Date:** Wednesday, January 28, 2021 at 2:58 PM
>
> Ok. That seems fair. 25 basis points as of 12,31,2020. Can this be paid in installments, as the trust has not been terminated yet?

105.    Several other emails were exchanged thereafter, in which Sarah and Ms. Sonn expressed affection and good-will towards one another, and in which Ms. Sonn stated that she "wouldn't be opposed to breaking it out over two years." Sarah confirmed that they were in agreement and indicated that she was just awaiting a response from Mr. Leberman regarding the most optimal schedule and timing for the disbursements, based on income tax considerations.

106.    The following week however, Ms. Sonn received an email in which Sarah essentially accused her of misconduct in the severance negotiations, as demonstrated by the following exchange:

> **From:** [Sarah]
> **To:**  [Ms. Sonn]
> **Date:** Tuesday, February 2, 2021 at 6:08 PM
> **RE:** Termination
>
> Hello Marlena.

I've decided to also terminate your employment as my [personal financial advisor]. I feel I have been taken advantage of for years by someone I trusted and thought of as a mother. I'm hurt, honestly.

---

**From:** [Ms. Sonn]
**To:** [Sarah]
**Date:** Tuesday, February 2, 2021 at 10:58 AM

… I have reached out by phone to you. Let's talk.

I have never overcharged you.  I am a Financial Advisor.  My practice has a standard 1% Assets Under Management fee, which every client pays.  I have delivered phenomenal investment performance in that time, especially on a risk-adjusted basis, for that fee.

But I don't think this is about my work, but about the nature of our friendship, which does go far beyond a professional relationship.

In which case, I'm going to ask you to call me, as your friend.

---

**From:** [Sarah]
**To:**  [Ms. Sonn]
**Date:** Tuesday, February 2, 2021 at 6:55 PM

As a CFP, yes. However, I reviewed your ask in regards of the severance payment… with an employment attorney, and she was appalled. I'm frankly insulted. I now don't trust you in any regard. Thank you for your service up until now. I wish you well. However, trust can not be amended once it is broken.

---

**From:** [Ms. Sonn]
**To:**  [Sarah]
**Date:** Tuesday, February 2, 2021 at 7:29 PM

Did your attorney also review the size of the Trust when I started in October 2013, the level of underperformance it was at, vs where it is now, analyzing its phenomenal asset growth and performance?

The strategy was implemented mainly by me, backbreaking piece by piece over seven years.  I worked alone, with no resources, as a labor of love to help you align the Trust with your values.

The portfolio was +4.4% above benchmark as of 9/30/2020, in large part because of the courageous stands I took to implement your wishes.

Please… share [this information] with your attorney, so that they can get some context...

I've spent the last seven years doing everything in my power to help you… and I really don't deserve to be shafted…

107.    What Ms. Sonn had asked for (and what Sarah had previously agreed to) was neither "appalling," nor unreasonable. In fact, it was substantially less than industry-standard performance incentives for sophisticated financial advisory services.

108.    Upon information and belief, Mr. Leberman, who had been openly hostile towards Ms. Sonn ever since she first voiced her opposition to the California tax avoidance scheme, was responsible for bringing about Sarah's sudden change in posture through this bevy of unwarranted accusations against Ms. Sonn.

109.    It bears mentioning that Mr. Leberman had no problem taking steps to ensure that his *own* deferred compensation incentives were secure, which he did, in part by through the creation of a Rabbi Trust for himself and other executives of Minerva. Upon information and belief, Mr. Leberman also has a compensation agreement in place for himself that would similarly provide substantial incentive payouts and/or severance compensation, in the event of an early termination. In short, it is abundantly clear that these allegations of misconduct were entirely pretextual and made in bad faith, to provide cover for the unlawful and retaliatory nature of Ms. Sonn's termination from ASG Investments. After all, Mr. Leberman could not have truly believed that Ms. Sonn's conduct was improper or inconsistent with her fiduciary obligations, seeing that he had previously negotiated the same sort of compensation arrangement for himself.

110.    On or around February 12, 2021, Sarah's attorney conveyed a proposed settlement offer of $30,000 in place of the $2.5 million severance payment that they had

previously agreed upon. Ms. Sonn rightfully rejected the offer and is now seeking fair and just compensation, via this lawsuit, for the value of her services as Vice President of ASG Investments from October 15, 2014 through January 27, 2021.

### H. Kendalle agrees to accelerate deferred compensation incentives in recognition of Ms. Sonn's outstanding performance and continued loyalty; then suddenly terminates Ms. Sonn at the insistence of others

111.   Despite being terminated by Sarah from ASG Investments in January 2021, and despite the increasing tension and hostility directed at her by Mr. Leberman and others, Ms. Sonn continued to excel in her role as Vice President of KPG Investments.

112.   On March 1, 2021, Ms. Sonn spoke with Kendalle about wanting to revisit her compensation structure in light of the circumstances, and reached an agreement, in principle, to accelerate the deferred compensation incentives that they had originally agreed upon back in 2017.

113.   This conversation was motivated by several factors, including the fact that the triggering event (*i.e.,* Gordon's passing) had not yet occurred—and in recognition of Ms. Sonn's continued loyalty and outstanding performance, in the midst of what had essentially become a hostile work environment.

114.   Ms. Sonn was also understandably concerned in light of what had happened with Sarah, and wanted some level of assurance that Kendalle, unlike Sarah, would honor the deferred compensation arrangement that they had agreed upon back in 2017, irrespective of when Gordon died and/or whether Ms. Sonn was still actively employed by KPG Investments when that time came to pass.

115.    After multiple discussions, Kendalle agreed to pay a bonus in the amount of $2.5 million to Ms. Sonn, representing a slight downward departure from the amount that she would have received under the original incentive agreement if based upon the value of the Pleiades Trust as of December 31, 2020.

116.    As with the previous negotiations over Ms. Sonn's compensation, Kendalle's principal concern was not about whether the amount was appropriate, but rather, about when these payments would be disbursed. Ms. Sonn reasoned that the payment should be made as soon as practicable, as "earned" compensation for her outstanding past performance and the corresponding growth of the Pleiades portfolio under her direction. Kendalle did not disagree, but understandably wanted to defer these payments until such time as she began receiving income distributions from the trust, which would give her access to significantly more capital than she was currently receiving in the form of trustee fees and participation payments. They settled on a middle ground, agreeing that the $2.5 million bonus payment would be paid out in three installments of $833,333, over the course of the next three years.

117.    In addition, and because the $2.5 million bonus was in recognition of her past performance, the agreement also differed from the original incentive plan in that the payment was not conditioned upon Ms. Sonn's continued employment with KPG Investments. The agreement also contained an acceleration clause that would be triggered if KPG Investments was dissolved and/or if Ms. Sonn was terminated from KPG prior to the final disbursement date.

118.    The agreement was memorialized in a letter entitled "KPG Bonus Amendment," that Ms. Sonn drafted and sent to Kendalle on or about March 12, 2021, and that Kendalle then executed on March 17, 2021.

119.    Upon information and belief, Kendalle signed the KPG Bonus Amendment agreement from California.

120.    Ms. Sonn had advised Kendalle to review the terms of their agreement with KPG Investment's outside counsel, but does not know whether Kendalle did so prior to signing the document.

121.    The first $833,333 installment of the KPG Bonus Amendment was paid to Ms. Sonn on March 31, 2021, without any problems, concerns, or indications of ill-will from Kendalle.

122.    On or about September 18, 2021, Mr. Nash, the previous Treasurer and Secretary of KPG Investments, passed away after a long battle with cancer. Upon information and belief, Mr. Leberman found out about the revised incentive agreement and corresponding payment that Marlena had received while going through files that Mr. Nash had previously maintained for KPG Investments files in his office, which Mr. Leberman was not authorized to review.

123.    Upon information and belief, Mr. Leberman confronted Kendalle about the payment shortly thereafter, and used this event as a justification for getting rid of Ms. Sonn once and for all. Upon information and belief, Kendalle was essentially strong-armed into going along with Mr. Leberman's plan, and did so, in part, because she was worried that

Mr. Leberman would have her placed under a conservatorship by portraying Kendalle's decision to accelerate Ms. Sonn's compensation incentives as evidence that she was not of sound mind and judgment.

124.   At the next quarterly trust meeting, on October 27, 2021, Kendalle complained to Ms. Sonn about the new bonus structure, saying that others had flagged it as "unusual," and insinuating that Ms. Sonn had taken advantage of her. Ms. Sonn was completely taken aback by this surprising turn in events.

125.   On information and belief, numerous individuals attending the October 27, 2021 quarterly trust meeting participated remotely from California.

126.   In a follow up call between Ms. Sonn, Kendalle, and Ms. Brown, Kendalle conveyed her concerns about not wanting to give Mr. Leberman any reason to have her placed under a conservatorship, and noted that Ms. Brown had also characterized the payment as being "unusual." When Ms. Sonn asked Ms. Brown whether she agreed with this characterization, she said something to the effect that "yes, but your role is also unusual," and "no one is saying that you shouldn't be compensated accordingly." The call ended with Kendalle saying that she wanted to revisit the revised compensation incentive agreement, but would consider a commensurate increase in Ms. Sonn's salary, and wanted to provide health insurance moving forward, along with all other benefits that Mr. Leberman and other similarly situated employees of Minerva had been receiving,

127.   Instead, on November 30, 2021, Ms. Sonn received a letter informing her that she was being terminated from her role as Vice President of KPG. The letter alleged, in sum

and substance, that Ms. Sonn had breached her fiduciary duties by asking Kendalle to revisit and accelerate the terms of her financial incentive payments, and made vague references to various unspecified misrepresentations and/or acts of supposed coercion that Ms. Sonn had purportedly undertaken to extract money from Kendalle.

128.    Kendalle never remitted the unpaid balance of the amount owed to Ms. Sonn per the March 17, 2021 agreement.

129.    Ms. Sonn continued to communicate with Kendalle and continued overseeing her personal investment portfolio for several more months—until on or about March 3, 2022, when Kendalle also transferred her personal investment account out from under Ms. Sonn's management.

130.    By the time their relationship ended, Ms. Sonn had grown Kendalle's personal investment account by approximately $7 million through her successful investment strategies (the total portfolio value was well over $22 million when Kendalle transferred her personal investment account out from under Ms. Sonn's management), and was also personally responsible for overseeing the growth of the Pleiades Trust from approximately $600 million to well over $1 billion, notwithstanding the generous annual payouts of accumulated trust income to Gordon.

**I. Retaliatory lawsuit in Nevada State Court; subsequent harassment and intimidation**

131.    After having failed to secure the remaining payments due to her by KPG Investments, Ms. Sonn retained the undersigned counsel.

132.    On or about March 4, 2022, the undersigned counsel sent a demand letter to Kendalle's attorneys at the law firm of Patterson Belknap Webb & Tyler LLP, setting forth the basis for the claims asserted herein, and seeking to invite a discussion about whether the matter might be resolved amicably, without having to resort to the instant litigation.

133.    On or about March 16, 2022, Kendalle's counsel informed the undersigned that they had filed a pre-emptive and retaliatory state court action against Ms. Sonn in Washoe County, Nevada, which had been filed under temporary seal, ostensibly for the mutual benefit of all parties.

134.    The Nevada State Court state court complaint is sanctionable as a frivolous complaint under Rule 11 because it is replete with allegations which Kendalle knows are demonstrably false—such as her claim that Ms. Sonn "actively discouraged" Kendalle from consulting with legal counsel about the acceleration of her deferred compensation incentives, when Ms. Sonn had, in fact, expressly advised Kendalle to do so.

135.    The complaint is also frivolous in that it essentially alleges that Ms. Sonn purportedly breached her fiduciary duties by seeking to secure fair and just compensation for her services. As the Defendants and their counsel surely know, however, the nature of fiduciary obligations cannot be so oppressive as to preclude fiduciaries from negotiating fair and just compensation for their services.

136.    Upon information and belief, Defendants have also sought to intimidate and harass Ms. Sonn by hiring a private investigator to follow and photograph her near her home, who has conspicuously photographed her walking her dogs around the

neighborhood on several occasions—and by threatening to ruin her professional reputation if she proceeds with his litigation.

## COUNT 1
### Unlawful Retaliation in Violation of Cal. Lab. Code § 1102.5
*(against all Defendants)*

137.    Plaintiff hereby repeats, realleges, and incorporates by reference all of the allegations in the preceding paragraphs, as if fully set forth herein.

138.    Section 1102.5 of the California Labor Code provides that "[a]n employer, or any person acting on behalf of the employer, shall not… "

(a) make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information… to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance… if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation…

(b) retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information… to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance… if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation… [or]

(c) retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

Cal. Lab. Code § 1102.5.

139.   Each of the Defendants named in this action was either Ms. Sonn's "employer," and/or an entity or person "acting on behalf of" her employer.

140.   As alleged herein, Ms. Sonn had reasonable cause to believe that Defendants were engaged in a scheme or conspiracy to avoid paying hundreds of millions in taxes to the State of California, in violation of multiple civil and criminal statutes at the local, state, and federal levels, in addition to any applicable tax rules and regulations, as well as those governing certain professions and/or fiduciaries.

141.   As alleged herein, Ms. Sonn also had reasonable cause to believe that Defendants were violating or otherwise failing to comply with local and/or state laws governing the employment of New York residents, by refusing to withhold New York State taxes or make any of the other requisite employer contributions (*e.g.,* disability insurance, paid family leave), throughout the course of her employment—despite knowing that Ms. Sonn performed substantially all of her work from her office and/or residence in New York.

142.   Ms. Sonn repeatedly raised her concerns about Defendants' violations of applicable law to the Defendants and others, who were all "person with authority over [her]… [as an] employee," and some of whom were also fellow employees with the "authority to investigate, discover, or correct" such violations or noncompliance.

143.   Defendants continuously advised and/or reminded Ms. Sonn about the importance of maintaining the appearance that all or substantially all business relating to Pleiades Trust was being conducted outside the State of California, so as to prevent trust

income from becoming taxable in California, when everyone knew a major portion of the trust's administration was continuously being conducted in and/or from Los Angeles or San Francisco, and elsewhere in the State of California.

144.    Defendants undertook numerous retaliatory actions against Ms. Sonn for her ongoing resistance, continuous objections to and/or raising concerns about the lawfulness of Defendants' actions—including but not limited to subjecting her to adverse employment consequences, a hostile work environment, the termination of her employment, the withholding of payments contractually owed to her as compensation earned in the course of her employment—and other various other actions undertaken to harass, threaten, and/or intimidate Ms. Sonn, such as the hiring of a private investigator to follow her around near her residence, and the filing of a baseless Nevada state court action against her.

145.    By reason of the foregoing, Defendants are liable for compensatory and punitive damages, together with penalties of up to $10,000 for each violation of Sections 1102.5 (a), (b), and (c), and for an award of attorneys' fees to Ms. Sonn for bringing the instant action, in total amounts to be determined at trial.

## COUNT 2
### Breach of Contract
*(against ASG Investments Inc.)*

146.    Plaintiff hereby repeats, realleges, and incorporates by reference all of the allegations in the preceding paragraphs, as if fully set forth herein.

147.   On or around January 28, 2021, Defendant Alexandra Sarah Getty, in her capacity as the President and sole shareholder of Defendant ASG Investments, entered into a valid agreement to make a severance payment in the amount of $2.5 million to Ms. Sonn, as fair compensation for her outstanding past performance as Vice President of ASG Investments, and as an alternative to the deferred compensation agreement that the parties had previously entered into on October 20, 2017.

148.   That payment has not been made and the parties have not been able to reach any other mutually agreeable alternative to the deferred compensation that Ms. Sonn was promised as fair compensation for her services as Vice President of ASG Investments.

149.   By reason of the foregoing, Defendant ASG Investments is liable for the $2.5 million severance payment, plus any applicable interest, that is still owing to Ms. Sonn.

## COUNT 3

### Quantum Meruit
*(against Alexandra Sarah Getty and ASG Investments Inc.)*

150.   Plaintiff hereby repeats, realleges, and incorporates by reference all of the allegations in the preceding paragraphs, as if fully set forth herein.

151.   As alleged herein, Ms. Sonn delivered valuable services to Defendants Alexandra Sarah Getty and ASG Investments from 2013 through 2021, for which she has not been fairly compensated.

152.   On or about January 28, 2021, Defendant Alexandra Sarah Getty, in her capacity as the President and sole shareholder of Defendant ASG Investments, agreed to make a $2.5 million payment to Ms. Sonn, as fair compensation for these services. Upon

information and belief, however, Defendants Alexandra Sarah Getty and ASG Investments now contest the validity and/or enforceability of that agreement.

153.    In the absence of a valid and enforceable agreement concerning the scope of Ms. Sonn's compensation in exchange for these services, Ms. Sonn is entitled to recover in quantum merit for the fair value of services rendered to Defendants.

## COUNT 4
### Breach of Contract
*(against KPG Investments Inc.)*

154.    Plaintiff hereby repeats, realleges, and incorporates by reference all of the allegations in the preceding paragraphs, as if fully set forth herein.

155.    On or around March 17, 2021, Defendant Kendalle P. Getty, in her capacity as the President and sole shareholder of KPG Investments, entered into a valid written agreement to pay an "Incentive Award" in the amount of $2.5 million to Ms. Sonn, as compensation for her outstanding performance as Vice President of KPG Investments.

156.    Pursuant to this agreement, the payment was supposed to be disbursed in three installments of $833,333 on March 31, 2021, March 31, 2022, and March 31, 2023, or within 30 days of any event triggering the acceleration clause, whichever sooner.

157.    The first installment payment was made on March 31, 2021, but the other two remain outstanding.

158.    On or about November 30, 2021, Ms. Sonn was terminated from her employment as Vice President of KPG Investments, thereby triggering the acceleration

clause such that the amount of the unpaid balance ($1,666,666) became due, on or about October 31, 2021.

159.    By reason of the foregoing, Defendant KPG Investments is liable for the unpaid balance $1,666,666, plus any applicable interest, that is still owing to Ms. Sonn.

## COUNT 5
### Quantum Meruit
*(against Kendalle P. Getty and KPG Investments Inc.)*

160.    Plaintiff hereby repeats, realleges, and incorporates by reference all of the allegations in the preceding paragraphs, as if fully set forth herein.

161.    As alleged herein, Ms. Sonn delivered valuable services to Defendants Kendalle P. Getty and KPG Investments, and others, from 2013 through 2021, for which she has not been fairly compensated.

162.    Pursuant to the agreement entered by Defendant Kendalle P. Getty, in her capacity as the President and sole shareholder of Defendant KPG Investments, on March 17, 2021, Defendants still owe $1,666,666 as earned compensation to Ms. Sonn for her services. Upon information and belief, however, Defendants Kendalle P. Getty and KPG Investments now contest the validity and/or enforceability of that agreement.

163.    In the absence of a valid and enforceable agreement concerning the scope of Ms. Sonn's compensation in exchange for these services, Ms. Sonn is entitled to recover in quantum merit for the fair value of services rendered to Defendants.

## COUNT 6

**Unjust Enrichment**
**(against all Defendants)**

164.     Plaintiff hereby repeats, realleges, and incorporates by reference all of the

allegations in the preceding paragraphs, as if fully set forth herein.

165.     Defendants have been unjustly enriched by reason of accepting Ms. Sonn's

profitable investment strategies and other services without fair compensation, including,

by way of example and without limitation:

    a.   Sarah and Kendalle benefitted as contingent remainder beneficiaries of the
        Pleiades Trust, as sole shareholders of ASG and KPG Investments, and
        through Ms. Sonn's financial management and advisory services for their
        personal investments, receiving fees, other payments, and appreciation in the
        value of their investments and contingent remainder interest in the Trust;

    b.   ASG and KPG Investments benefitted as corporate trustee of the Pleiades
        Trust, receiving fees and other payments;

    c.   Minerva benefited as the administration office of the Pleiades Trust,
        receiving fees and other payments; and

    d.   Leberman benefitted as President of Minerva and as Trust Administrator of
        the Pleiades Trust, receiving fees and other payments.

166.     By reason of the foregoing, Defendants are liable for damages including but

not limited to disgorgement of profits for all such amounts earned by and through the

services delivered by Ms. Sonn.

## COUNT 7

### Tortious interference, Willful Misfeasance and Bad Faith
### (against Minerva Office Management, Inc. and Robert L. Leberman)

167.    Plaintiff hereby repeats, realleges, and incorporates by reference all of the allegations in the preceding paragraphs, as if fully set forth herein.

168.    As alleged herein, the termination of Ms. Sonn's employment with ASG and KPG Investments and the subsequent withholding of amounts due to her as earned compensation were the direct and/or proximate result of Defendant Minerva Office Management and/or Defendant Robert L. Leberman's willful misfeasance and retaliatory bad faith actions directed at Ms. Sonn for expressing objection to and resisting against the unlawful tax avoidance scheme that he devised and/or implemented.

169.    By reason of the foregoing, Defendants Minerva Office Management and Robert L. Leberman are jointly and severally liable for tortious interference.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor awarding compensatory and punitive damages against the Defendants, in an amount to be proven at trial, together with the applicable statutory penalties, an award of attorneys' fees, costs and expenses, and any other such relief as the Court deems just and equitable.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury as to all issues and causes of action stated herein.

Dated:    May 11, 2022
           New York, NY

**POLLOCK COHEN LLP**

By:   */s/ Agatha M. Cole*
       Agatha M. Cole
       Max Rodriguez
       60 Broad Street, 24th Floor
       New York, NY 10004
       Email: agatha@pollockcohen.com
       Telephone: (212) 337-5361